## JARRETT v. PITTSBURGH PLATE GLASS CO.

### No. 10285.

Circuit Court of Appeals, Fifth Circuit.

Nov. 14, 1942.

Robert L. Anderson, of Macon, Ga., for appellant.

William A. Fuller, of Atlanta, Ga., for appellee.

Before SIBLEY, HUTCHESON, and HOLMES, Circuit Judges.

SIBLEY, Circuit Judge.

Pittsburgh Plate Glass Company sued H. K. Jarrett on a note, with interest at 7% from its date. Liability for interest was denied, and a counter-claim was made for damages for breach of a contract that Jarrett should be sole dealer in Macon, Ga., for the products of Pittsburgh, and the damages were asked to be tripled because of a breach of the federal anti-trust laws. A motion to dismiss the counter-claim and one for summary judgment on the other pleadings were decided in favor of Pittsburgh, and Jarrett appeals.

The counter-claim is based on a printed form contract dated January 8, 1930, by which Jarrett agreed that as distributor for Pittsburgh Proof products he would maintain an adequate stock to serve the requirements of his trade, would aggressively push their sale, and take advantage of the Company's advertising and make other cooperative efforts. The Company agreed that at the end of every twelve months period in which the dealer had bought at the Company's printed prices, with dealer's discounts, and paid for a total amount of $10,000 but less than $15,000, it would set up on its books profits for the dealer of 7½% on one group of products and 10% on another group; and it was agreed that the Company might terminate the agreement at any time should the dealer fail to comply with the terms of sale or to cooperate fully. Added in writing at the end are these words: "The Company agrees to confine the sale of Proof Products to the above dealer for Macon, Ga." It is alleged that Jarrett complied with his contract, but on March 1, 1941, Pittsburgh Plate Glass Company over his protest opened a branch store in Macon, Ga., and began itself to sell Proof Products at prices less than Jarrett could profitably sell them, to the damage of his business $5,000, and causing a loss to him in the value of goods on hand of $800. These damages are also sought to be trebled by allegations noted hereafter.

■ ■ It is argued that since this contract was indefinite as to its duration, it was only at the will of the parties; or that it was terminable after reasonable notice; or at the end of each twelve month period. On the other hand, it is argued that it was

676

intended to last so long as the respective parties continued to buy and sell Proof Products .and Jarrett complied with the terms of sale and cooperated, failure to do which was the sole reason for which the contract could be terminated by Pittsburgh. It is also argued that Jarrett was not bound to buy any amount of goods, and the contract was unilateral and not binding on either from the beginning. We find it unnecessary to decide these contentions, because the Robinson-Patman Amendment of the Clayton Antitrust Act, 15 U.S.C.A. Sect. 13(c), became law on June 19, 1936, 49 Stat. p. 1527. It prohibited receipt or payment of commissions or discounts in lieu thereof in sales transactions except for services rendered. Jarrett was not rendering service to Pittsburgh, but was buying its goods and reselling them as his own. It is conceded that after this Amendment the agreed percentage rebates could not lawfully be paid, and were not paid. Pittsburgh's promise to pay them could not be performed. If Jarrett was previously bound to buy such goods as his trade required, he was no longer so bound, because Pittsburgh could not perform one of its principal promises. The contract was not severable. Jarrett was to buy in consideration of two promises: first that he be credited with the percentage rebates, and second that he be sole dealer for Macon. He could not be made to continue to buy if part of the consideration for his obligation was withdrawn. Further buying therefore became optional with him, and since he was not bound on his part, neither was Pittsburgh. Pepsi-Cola Co. v. Wright, 187 Ga. 723, 2 S.E.2d 73. The parties could have agreed to continue their relationship with the rebates eliminated, but no such agreement is alleged. The bare fact that Pittsburgh continued to sell to Jarrett as before for several years is not enough to show a binding agreement of that sort. We hold that when Pittsburgh decided in 1941 to operate a branch store in Macon it violated no contract with Jarrett.

■ A cause of action for triple damages (15 U.S.C.A. § 15) is also asserted under the Clayton Act as amended, 49 Stat. p. 1526, in that Pittsburgh was engaged in interstate commerce and in its branch store it offered to the public its products in competition with Jarrett, and sold them for less than they had previously been sold in Macon and at less prices than Jarrett as dealer could afford to sell them, driving

him out of business. It is not clear that Pittsburgh, in putting in a stock of goods and retailing them locally, would be engaged in interstate commerce, but assuming that to be true, we see no breach of the law in what is alleged. It is not alleged that the prices at which sales were made to Jarrett were cut as to others, or that prices in Macon were cut below those made for other like markets, or that there was a refusal to sell to Jarrett at dealers' prices, or that there was any intent or any effect to monopolize the business. The Company could retail its own goods a little cheaper than Jarrett could after buying them at the usual dealers' prices, and that is all. No cause of action is shown. The counter-claim was properly stricken.

■■ The note sued on is a printed form reading as to interest thus: "Jan. 10, 1935. For Value received I promise to pay Pittsburgh Plate Glass Co., or order, the sum of Eight Thousand Eight Hundred Dollars, with interest from this date at the rate of — per cent per annum, in monthly installments payable as follows: $100 on Jan. 25, 1935, $100 on Feby. 25, Mar. 25, Apl. 25, 1935; $150 May 25, June 25, July 25, Aug. 25, Sept. 25, Oct. 25, 1935; $100 Nov. 25 and Dec. 25, 1935. Balance to be put into new note Jany. 1, 1936. * * * Each installment shall be first applied in payment of the interest and then on the unpaid balance of the principal sum. If default is made in the payment of any installment when due, then all the remaining installments shall become due and payable at once. * * *" The form evidently contemplated interest from date at a rate to be filled in the blank above indicated, but instead of naming a rate, a pen mark was drawn horizontally through the space. It is pleaded that this was done to indicate that no interest was to be paid, which was the agreement of the parties, and was intended to be equal to the word "No". The court below held that the effect of the dash was to leave the space unfilled, with an agreement expressed to pay interest from date, but with no agreement as to the rate, so that the legal rate of 7% applies. We are of opinion that the dash might have been intended to signify no rate at all, eliminating interest from date, and that there is enough ambiguity about it to admit proof as to the true agreement, making an issue for trial. But appellee agrees in argument to write off the interest from date and include only interest after maturi-

ty, which would in any case be due, rather than suffer reversal. The excessive interest is not very much, for it appears that there was default in paying the instalment due April 25, 1935, and also May, June and July, 1935, whereby the whole note was made due and payable as early as April 25, 1935. The interest on $8,800 at 7% from January 10, 1935, to April 25, 1935, erroneously included in the judgment as we understand, is $179.66. That amount is deducted from the interest recovered, and the judgment otherwise affirmed, with costs of appeal awarded the appellant.

Modified and affirmed.